UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DOUGLAS A. REAVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:15-cv-00415-WTL-DKL |
| | ) | |
| MARTIN, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Motion for Emergency Injunction**

Plaintiff Douglas Reaves, an inmate at the Wabash Valley Correctional Facility, brought

this action pursuant to 42 U.S.C. § 1983 alleging that the defendant medical providers failed to

properly diagnose and treat his foot pain. He moves for a preliminary injunction that would require

medical staff send him to an off-site foot specialist to have a bone spur and spur fragment removed

from his left foot. For the following reasons, Reaves's motion [dkt 35] is **granted in part** to the

extent that the defendants are directed to refer Reaves to an outside specialist to evaluate his current

condition.

**I. Background**[1]

A. *Reaves's Initial Pain Complaints*

On July 16, 2014, Reaves was examined by Dr. Martin for his complaints of left heel pain.

Dr. Martin reviewed Reaves's records and labs and performed a physical examination. Upon

examination, Dr. Martin determined that Reaves's heel was painful, but there was no obvious cause

---

[1] The Court notes that the defendants' statement of facts is replete with medical jargon. Counsel for the defendants is **admonished** in future filings to avoid medical jargon in favor of explaining the facts of a case in language that is more easily understood by non-medical personnel.

of the pain. Dr. Martin recommended gel insoles, lifestyle modification (no running and jumping sports), and considering an injection in the future. He prescribed delayed release Ecotrin daily for pain and scheduled Reaves to return in two months.[2]

On September 4, 2014, Reaves saw Dr. Rajoli in chronic care for his hypertension ("HTN"), GERD, hyperlipidemia, and plantar fasciitis. Dr. Rajoli noted Reaves had tried over the counter foot inserts without much help, and he provided arch supports. Reaves was prescribed delayed release Ecotrin daily for pain and was scheduled to return in three months. On October 14, 2014, Reaves received orthotic arch supports.

On December 30, 2014, Reaves submitted a request for health care ("HNR") stating he was having problems with his left foot again and needed to see the doctor. On January 1, 2015, he saw a nurse in response to his HNR. Reaves was prescribed delayed release Ecotrin daily for pain. The nurse referred him to a provider as his foot pain was not improving.

B. *Plantar Fasciitis Diagnosis*

Dr. Byrd saw Reaves for the first time on January 8, 2015 for his complaints of left foot pain. Reaves reported the pain began in his left heel but now covered the arch and midfoot. He had tried orthotics, but the pain was getting worse. Reaves reported mild swelling of the left foot, but no rash, lower leg swelling, chest pain, palpitations, or other complaints. Dr. Byrd performed an examination and noted joint pain and swelling. The left ankle had no cracking sounds or deformity, but was inflexible. He diagnosed Reaves with acute plantar fasciitis[3] and joint and foot pain, and

---

[2] Reaves asserts that he had been receiving Ecotrin to reduce the risk of stroke and blood clots long before his foot problems began.

[3] Dr. Byrd states that plantar fasciitis is one of the most common causes of heel pain. It involves pain and inflammation of the plantar fascia, a thick band of tissue that runs across the bottom of the foot and connects the heel bone to the toes. Most people who have plantar fasciitis recover with conservative treatments in just a few months. Such conservative treatments include pain relievers such as ibuprofen and naproxen, as well as stretching and strengthening

2

ordered x-rays to rule out a possible stress fracture. Dr. Byrd also continued the daily delayed release Ecotrin and ordered prednisone 20 mg twice daily for pain. On January 9, 2015, Reaves had x-rays of his foot. The x-rays showed no acute bony abnormality but there was a heel spur.

Inflammation of the tissue on the bottom of the foot, plantar fasciitis, can lead to a bone spur at the underside of the heel bone. Bone spurs may or may not cause symptoms, and they are treated only if they are causing symptoms. Initial treatment is directed toward decreasing inflammation and avoiding re-injury. Anti-inflammatory medications, administered both orally and by local injection, are commonly used, depending on the location of the spur. Mechanical measures such as orthotics, shoe inserts, and bone spur pads might be considered, depending on the location of the bone spur. Shoe inserts take pressure off plantar spurs. Bone spurs that are causing irritation of nerves, tendons or ligaments and are resistant to conservative measures can require surgical operations for treatment. However, this is infrequently done on chronically inflamed spurs.

On January 30, 2015, Reaves received issued arch supports. Dr. Byrd saw him on February 13, 2015 for a chronic care visit and noted that reported severe left heel pain. He scheduled Reaves to return for an injection into the plantar fascia. In the meantime, he was prescribed Ecotrin and prednisone for pain. On March 13, 2015, Dr. Byrd performed an injection of methylprednisolone acetate into the plantar fascia. This medication is a corticosteroid commonly used in the medical community to treat pain and swelling that occurs with arthritis and other joint disorders.

C. *Podiatrist Consultation and Surgery*

---

exercises, including physical therapy, splints, and orthotics. If conservative treatments fail to work, it is common to prescribe steroid shots or even surgery to detach the plantar fascia from the bone.

Dr. Byrd saw Reaves again on April 1, 2015. Reaves requested a podiatry visit and reported the prednisone had become less effective and stretching and rehab did not provide relief.[4] Dr. Byrd submitted a request for a podiatrist, which was approved. On May 8, 2015, Reaves had x-rays of his foot, which showed no fracture or dislocation. There was a heel spur but no acute bony abnormalities.

On May 13, 2015, Reaves saw the podiatrist, Dr. Elliot Kleinman. Dr. Kleinman performed a physical examination and reviewed x-ray results. He noted that x-rays revealed a prior fracture of the left heel spur with approximately a 4mm displacement. He assessed: (1) unresolved acute plantar fasciitis; and (2) apparent prior fracture with calcaneal spur, left heel. Dr. Kleinman discussed a potential surgical procedure for correction of plantar fasciitis including cutting part of the plantar fascia ligament to release tension and relive inflammation. Reaves wished to proceed with the surgery. Dr. Byrd submitted a request for the surgery, which was approved.

On July 1, 2015, Dr. Kleinman performed the surgery. Dr. Kleinman's post-operative instructions were listed alongside two boxes, one each for "Yes" or "No." Under "Yes," the following instructions applied: (1) Keep foot/feet elevated approximately 6 inches above your hip whenever not walking; (2) keep dressing dry unless otherwise instructed; (3) apply ice packs to the top of the foot/back of the knee 4 times a day, approximately 30 minutes at a time until the first postoperative visit; (4) light ambulation is permitted in your walking boot/surgical shoe only; (5) the walking boot/surgical shoe must be worn whenever weightbearing is permitted; and (6) the walking boot/surgical shoe may be removed whenever not weightbearing. Under the "No" column, the following instructions did not apply: (1) you are to be completely non-weightbearing on the

---

[4] The parties disagree regarding the immediate efficacy of the steroid injection. Dr. Byrd charted that Reaves experienced 100% relief. Reaves asserts now that the injection never provided him with any relief.

surgically operated foot; and (2) the walking boot/surgical shoe may not be removed until the first postoperative visit. Dr. Kleinman DID NOT order Reaves to be completely non-weightbearing.

The discharge instructions also stated to follow up with Dr. Kleinman in 10 days to 2 weeks and included aspirin and Norco, which is a combination of hydrocodone and acetaminophen. The postoperative instructions also stated, "DO NOT change the dressing unless instructed by our staff to do so. This is a sterile environment and should not be taken off until your first postoperative visit." This instruction was included to make sure patients did not remove the bandages on their own in their homes or other non-sterile environments. However, according to Dr. Byrd, the bandages and dressings could be removed in the prison medical unit because it is a sterile environment.

Reaves saw Nurse MacDonald after he returned from his surgery on July 1, 2015. MacDonald called Dr. Martin and left a message regarding Reaves's return and his Norco prescription. MacDonald educated Reaves on the discharge instructions and he returned to the housing unit with a polar ice machine.

On July 2, 2015—the day after the surgery—Nurse Wright submitted a consultation request for Reaves's two-week follow up with Dr. Kleinman. The request was approved on July 5, 2015, and Administrative Assistant and Trips Coordinator Amy Farmer contacted Dr. Kleinman's office on July 6, 2015 to schedule the appointment. The medical staff at the prison has no control over the specialist's availability and must schedule the patients when there are open appointments.

Also on July 2, 2015, Wright updated Reaves's chart. A three-week lay-in for medications and meals was approved, Reaves's prescription for Norco was approved and filled, and a polar ice

machine was to be on for swelling. Dr. Kleinman ordered the Norco prescription and Dr. Martin approved it and picked it up from a CVS pharmacy to avoid delay.

Dr. Byrd saw Reaves on July 6, 2015 for a follow up. Dr. Byrd noted that Reaves was scheduled for his follow up with podiatry, but the appointment was nearly three weeks away. Because they were unable to get Reaves back to Dr. Kleinman's office sooner for his follow-up, they needed to remove the dressing and inspect the surgical wound. Three additional weeks would be too long to wait before checking on the healing of the wound because an infection could start within that time. He reported Norco was controlling his pain but made him nauseated. Upon examination, the surgical wound was clean, dry, and intact. A purse string type suture was in place and there was no active bleeding or significant bruising. Reaves was scheduled for a chronic care visit in one week, so Dr. Byrd planned to follow up again at that time. He ordered x-rays of Reaves's foot to review at the follow up.

On July 7, 2015, Reaves had x-rays of his left foot. There was no acute fracture or dislocation and joint spaces appeared normal. Soft tissues were unremarkable, with no erosions. There was a small stable fragmented growth, likely degenerative. Dr. Byrd identified: (1) no acute osseous abnormality; and (2) a degenerative heel spur.

D. *Return to Podiatrist*

On July 26, 2015, Reaves returned to see Dr. Kleinman for his postoperative follow-up. Reaves stated that his heel pain and all pre-surgical symptoms had completely resolved. He was now complaining about a feeling of pins and needles and numbness in his left foot. Dr. Kleinman performed a physical examination and noted the surgical incision was dry, intact, and without dehiscence, which is a surgical complication in which a wound ruptures along the surgical incision.

6

He assessed normal postoperative healing and possible early tarsal tunnel compression of the left ankle. He reviewed with Reaves his impressions, results of surgery, the process of soft tissue repair, and the cause and potential treatment options for tarsal tunnel compression. He explained that postoperative swelling could cause tarsal tunnel compression. Dr. Kleinman wrote that no further treatment was indicated at this time and advised a follow-up in one month if the numbness and pins and needles sensations did not improve.

The tarsal tunnel refers to the canal formed between the medial malleolus (part of the ankle bone) and the flexor retinaculum (a band of ligaments that stretches across the foot). Inside the tarsal tunnel are the nerves, arteries, and tendons that provide movement and flexibility to the foot. One of the nerves in the tarsal tunnel is the tibial nerve, which provides sensation to the bottom of the foot. When this nerve is compressed, the resulting condition is called tarsal tunnel syndrome. Tarsal tunnel syndrome may be caused by an injury, disease, or due to the natural shaping of the foot. Symptoms of tarsal tunnel syndrome may include shooting pain in the foot, numbness, and tingling or burning sensation. It is common in the medical community to recommend nonsurgical treatment options before surgery. Possible treatment options may include anti-inflammatory medications or steroid injections into the nerves in the tarsal tunnel to relieve pressure and swelling. Orthosis (e.g., braces, splints, orthotic devices) may be recommended to reduce pressure on the foot and limit movement that could cause compression on the nerve.

E. *Continuing Complaints of Pain*

On September 8, 2015, Reaves submitted an HNR stating he was having sharp pain and a hard time walking, and requested to be seen. He saw a nurse for his complaints on September 10, 2015. The nurse ordered x-rays and new insoles. Reaves signed a receipt for the new gel insoles

on September 18, 2015. On October 7, 2015, Reaves submitted an HNR stating he was still having problems with his foot and requested an x-ray. Dr. Byrd ordered x-rays the next day, October 8, 2015. Reaves was prescribed daily delayed release Ecotrin for pain. On October 9, 2015, he had x-rays of his left foot, which showed no fracture or dislocation. The tarsal elements were in anatomic alignment and no significant degenerative change was seen. The x-ray showed no acute bony abnormality of the left foot, but heel spurs. Dr. Byrd saw Reaves again on October 23, 2015 for a chronic care visit for his HTN, lipids, and GERD. While he noted that Reaves was "doing excellent postoperatively as pain free. No med changes," Reaves asserts that he was in extreme pain at this time and having a hard time walking.

On November 11, 2015, Reaves submitted an HNR complaining of foot problems and requesting to return to the podiatrist. Dr. Byrd responded that Reaves's x-rays looked good and recommended no recreational activities for six weeks and a walking boot. Dr. Byrd's decision to recommend no recreation and a walking boot was based on Dr. Kleinman's findings that Reaves may have early tarsal tunnel syndrome. Limiting recreational activities such as basketball and wearing a walking boot would help reduce pressure on the foot and limit movement that could cause compression on the nerve. Reaves refused the treatment and signed a refusal. Reaves requested again to see the surgeon.

Dr. Byrd saw Reaves again on January 27, 2016 for a chronic care visit for HTN, lipids, GERD, and left foot pain. Reaves reported that pain began in his left heel but now encompassed his arch and midfoot. He believed there was swelling in the area, but Dr. Byrd could not detect any swelling. Reaves stated he believed more surgery was required for his heel spurs and wanted to see Dr. Kleinman again. Dr. Byrd noted that Dr. Kleinman found that Reaves may have tarsal

8

tunnel syndrome but his plantar fasciitis was completely resolved. Dr. Byrd planned to submit a consultation request for Reaves to return to Dr. Kleinman, and he continued his other medications and ordered additional x-rays.

On January 29, 2016, Reaves had x-rays of his foot. The x-rays showed: (1) no bony abnormality left foot; (2) a calcaneal spur; and (3) plantar fascia calcification nonspecific and unchanged from previous exam. On February 5, 2016, Dr. Byrd submitted a consultation request for Reaves to return to Dr. Kleinman, which was approved. On February 17, 2016, he ordered additional x-rays, which showed no acute bony abnormality of the left foot, and a heel spur and plantar fascia calcification. The findings were nonspecific but plantar fasciitis was considered.

F. *Follow-up with Podiatrist*

On March 2, 2016, Reaves returned to Dr. Kleinman. Dr. Kleinman noted Reaves had a prior plantar fascial release and did improve. Upon examination, there was only mild pain on direct palpation of the plantar aspect of the left heel. The plantar fascia was intact. Dr. Kleinman assessed: (1) acceptable postoperative healing, plantar fascial release, left heel; and (2) tarsal tunnel compression, left ankle. He reviewed the treatment options, including benign neglect, cortisone injections, ankle bracing, physical therapy, and possible surgical decompression. He recommended a neurology consult and testing and a follow up after testing.

Dr. Byrd saw Reaves on March 10, 2016 to follow up from his visit with Dr. Kleinman. Reaves disagreed with Dr. Kleinman's diagnosis of tarsal tunnel syndrome, but agreed to the plan. Dr. Byrd submitted a consultation request for the EMG/NCV testing, which measures the functioning of the nerves, recommended by Dr. Kleinman. On May 12, 2016, Reaves had an EMG/NCV test to evaluate tarsal tunnel syndrome or other neuropathy possible causing foot pain.

The nerve conduction tests were within normal limits and all examined muscles showed no evidence of electrical instability. Overall, the EMG/NCV was normal.

Dr. Byrd saw Reaves on May 20, 2016 to follow up from his EMG/NCV. Reaves had no constitutional complaints, and Dr. Byrd submitted a consultation request for him to return to Dr. Kleinman for a follow up.

G. *Denial of Further Consultation*

On June 18, 2016, Reaves saw a nurse in sick call and said he needed to see the doctor about his left foot. He also wanted to know if the trip to Dr. Kleinman had been approved. The nurse noted that an alternative treatment plan had been returned suggesting supportive therapy and education that the EMG was normal and to treat the pain symptoms. On June 22, 2016, Reaves saw Dr. Mary Chavez for his left foot pain. She noted Reaves needed clearance for surgery on his left foot due to plantar fasciitis and a heel spur. Reaves was prescribed daily delayed release Ecotrin for pain.

On July 19, 2016, Reaves's medications were renewed, including his daily delayed release Ecotrin for pain. On August 2, 2016, Dr. Chavez requested approval of Tylenol 325 tabs 2 by mouth twice per day and Naprosyn 500 mg 1 per mouth twice per day. She explained that the effect of these two medications working together should provide needed relief of pain.

## II. Discussion

Reaves seeks an injunction in the form of an order that he be seen by an "off-site foot specialist to have the bone spur and spur fragment removed from his left foot."

To succeed in obtaining preliminary injunctive relief, Reaves must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm if preliminary relief is

not granted, that the balance of equities tips in his favor, and that it is in the public interest to issue

an injunction. *United States v. NCR Corp.,* 688 F.3d 833, 837 (7th Cir. 2012). A preliminary

injunction is "an extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S.

968, 972 (1997). The movant bears the burden of proving his entitlement to such relief. *Cooper v.*

*Salazar,* 196 F.3d 809, 813 (7th Cir. 1999).

1. <em>Likelihood of Success on the Merits</em>

The defendants argue that Reaves has not shown that he is reasonably likely to succeed on

the merits of his claims. The essential underlying claim in this action is that the defendants have

been deliberately indifferent to his need for treatment of his foot pain. To prevail on an Eighth

Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1)

he suffered from an objectively serious medical condition; and (2) the defendant knew about the

plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v.*

*Brennan*, 511 U.S. 825, 8374 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d

766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

The defendants do not argue that the first prong of the deliberate indifference analysis – an

objectively serious medical condition – is not satisfied here. Nor could they. "A medical condition

is objectively serious if a physician has diagnosed it as requiring treatment, or the need for

treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

Ongoing and severe pain, as Reaves alleges, is obviously a condition requiring treatment.

The defendants do argue that Reaves cannot satisfy the second element of deliberate

indifference – that they disregarded this serious condition. "[C]onduct is 'deliberately indifferent'

11

when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The Court concludes that Mr. Reaves has a reasonable likelihood of success on his claims. The claims that are most relevant to Reaves's request for injunctive relief are his claims against Dr. Byrd. Reaves alleges, among other things, that Dr. Byrd failed to properly treat his pain and failed to ensure he received follow-up treatment from the surgeon. The defendants argue that Dr. Byrd prescribe appropriate conservative treatment for Reaves's pain and that Reaves is not entitled to the best care possible or to dictate his own care. It is true that inmates may not demand specific

treatment or the best care possible, but it is also true that they are "entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011). To meet the deliberate indifference standard, "a prisoner is not required to show that he was literally ignored." *Conley v. Birch,* 796 F.3d 742, 748 (7th Cir. 2015) (internal quotation omitted). Even if "some minimal treatment" is provided, a plaintiff may still show deliberate indifference. *Id.* "[A] doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment." *Berry v. Peterman,* 60-4 F.3d 435, 441 (7th Cir. 2010). (internal quotation omitted).

Here, Reaves has shown a reasonable likelihood of success on the merits of his claim that he has not received constitutionally adequate care for his foot pain since 2014. First, while the defendants assert that Reaves was prescribed Ecotrin for his pain, Reaves asserts that he has received Ecotrin since 2013 to treat his heart condition and prevent blood clots or stroke. Further, Dr. Byrd himself testifies that naproxen and ibuprofen are appropriate conservative pain relievers for plantar fasciitis, but Dr. Byrd does not explain why this treatment was not provided to Reaves until August of this year, over two years after he began complaining of pain. Next, there is significant evidence in the record that further follow-up with the podiatrist is appropriate at this time. While Reaves underwent surgery in an attempt to relieve the pain, he asserts that he feels no pain relief from the surgery and has experienced numbness and tingling in his foot since the surgery. Reaves saw the podiatrist for these complaints who recommended testing to rule out nerve compression. Importantly, the podiatrist recommended that he return after the testing. Reaves underwent the testing and a neurologic cause of his pain and tingling sensation was ruled out. At that time, Dr. Byrd submitted a consultation request to have Reaves follow up with the specialist.

13

But that follow-up was denied and instead an alternative treatment plan of supportive therapy and education and treatment for the pain. For the first time, Reaves received Tylenol and Naprosyn for his pain. The defendants argue that no further consultation is yet required and that Reaves must give this alternative plan a chance to work.[5] But the podiatrist and Dr. Byrd have both already stated that a consultation would be necessary after the neurologic testing. In other words, there is medical evidence in the record to support a conclusion that Reaves should have further consultation with the podiatrist regarding his ongoing pain.

2. *Balancing of the Harms*

The defendants also argue that the other factors governing injunctive relief weigh in their favor. They argue that the balance of the harms weighs in their favor because Reaves will experience no harm and that the Court should "afford appropriate deference and flexibility to state officials trying to manage" prisons. *See, e.g.*, *Sandin v. Conner*, 515 U.S. 472, 482-83 (1995). In support of their argument that Reaves will experience no harm, the defendants assert that Reaves should give the alternative treatment plan of Tylenol and Naprosyn a chance to work and that the podiatrist has not recommended further surgery. They also argue that Reaves appears to be in no pain while working in the kitchen and walking to his job. But Reaves has asserted his suffering is severe. The Court finds that Reaves knows more about whether he is in severe pain than does Dr. Byrd. In addition, while further surgery has not yet been recommended, it is undisputed that the podiatrist did recommend a repeat consultation if Reaves. This further consultation has not yet taken place. Under these circumstances, the balance of equities tips in favor of Reaves.

### III. Conclusion

---

[5] The defendants provide no explanation for why this alternative treatment was not recommended earlier in the two years between when Reaves started complaining of pain and the present.

14

For the foregoing reasons, Reaves's motion for preliminary injunctive relief [dkt. 35] is **granted to the extent that Dr. Byrd, or his designee with the authority to do so, shall refer Reaves to an outside orthopedic specialist** to examine and evaluate Reaves's foot pain. The Court **denies** Reaves's request for specific surgery, and leaves whatever treatment, if any, is appropriate, to the determination of the specialist. The specialist shall be given a copy of this Entry.

Dr. Byrd or his designee shall **report not later than November 1, 2016,** that the referral has been made and an appointment has been scheduled as promptly as reasonably possible, taking into account the specialist's schedule. The specialist's treatment plan shall be followed.

**IT IS SO ORDERED.**

Date: 10/5/16

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Douglas A. Reaves
881987
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All electronically registered counsel